## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MICHAEL W. WALIZER, | : | CIVIL NO.: 1:24-cv-00025 |
| | : | |
| Plaintiff, | : | (Magistrate Judge Schwab) |
| | : | |
| v. | : | |
| | : | |
| | : | |
| LELAND DUDEK, [1] | : | |
| Acting Commissioner of | : | |
| Social Security, | : | |
| | : | |
| Defendant. | : | |

### MEMORANDUM OPINION

## I. Introduction.

In this social security action, Plaintiff Michael W. Walizer seeks judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying his claims for disability insurance benefits and supplemental security income under Titles II and XVI of the Social Security Act. We have jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c)(3). For the reasons

_____

[1] Leland Dudek is now the Acting Commissioner of Social Security, and he is automatically substituted as the defendant in this action. *See* Fed. R. Civ. P. 25(d) (providing that when a public officer sued in his or her official capacity ceases to hold office while the action is pending, "[t]he officer's successor is automatically substituted as a party"); 42 U.S.C. § 405(g) ("Any action instituted in accordance with this subsection shall survive notwithstanding any change in the person occupying the office of Commissioner of Social Security or any vacancy in such office.").

set forth below, we will affirm the Commissioner's decision and enter judgment in favor of the Commissioner.

## II. Background and Procedural History.

We refer to the transcript provided by the Commissioner. *See docs. 12 -1* to *12-7*.[2]  In 2021, Walizer protectively filed[3] an application for disability insurance benefits and an application for supplemental security income, alleging that he has been disabled since March 2, 2021. *See Admin. Tr.* at 197–207.  After the Commissioner denied his claims at the initial and reconsideration levels of administrative review, *id*. at 106–115, 122–129, Walizer requested an administrative hearing, *id.* at 130.  On November 22, 2022, Walizer—who was represented by counsel—as well as a vocational expert testified at a hearing before Administrative Law Judge Michele  Stolls (the "ALJ"). *Id*. at 45–71.  On December 1, 2022, the ALJ denied Walizer's claims for benefits. *Id*. at 19–44. Walizer appealed the ALJ's decision to the Appeals Council, which denied his

---

[2] Because the facts of this case are well known to the parties, we do not repeat them here in detail.  Instead, we recite only those facts that bear on Walizer's claims.

[3] "Protective filing is a term for the first time an individual contacts the Social Security Administration to file a claim for benefits." *Stitzel v. Berryhill*, No. 3:16-CV-0391, 2017 WL 5559918, at *1 n.3 (M.D. Pa. Nov. 9, 2017).  "A protective filing date allows an individual to have an earlier application date than the date the application is actually signed." *Id*.

request for review. *Id*. at 1–7.  This makes the ALJ's decision the final decision of the Commissioner subject to judicial review by this Court.

In January 2024, Walizer, proceeding pro se, began this action by filing a complaint seeking review of the Commissioner's decision denying his claims. *See Doc. 1*.  He requests that the court remand the case for a new hearing. *Id*. at 2 (Wherefore Clause).  Although Walizer filed his complaint pro se, counsel later entered an appearance on his behalf. *See doc. 8* (Entry of Appearance).

The parties consented to proceed before a magistrate judge pursuant to 28 U.S.C. § 636(c), and the case was referred to the undersigned. *Doc. 10*.  The Commissioner then filed an answer and a certified transcript of the administrative proceedings. *Docs. 11, 12*.  The parties filed briefs, *see docs. 23, 29, 34*, and this matter is ripe for decision.

## III.  Legal Standards.

### A. Substantial Evidence Review—the Role of This Court.

When reviewing the Commissioner's final decision denying a claimant's application for benefits, "the court has plenary review of all legal issues decided by the Commissioner." *Ficca v. Astrue*, 901 F. Supp. 2d 533, 536 (M.D. Pa. 2012). But the court's review of the Commissioner's factual findings is limited to whether substantial evidence supports those findings. *See* 42 U.S.C. § 405(g); *Biestek v.*

*Berryhill*, 587 U.S. 97, 99 (2019).  "[T]he threshold for such evidentiary sufficiency is not high." *Biestek*, 587 U.S. at 103.  Substantial evidence "means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (quoting *Consol. Edison Co. of New York v. N.L.R.B.*, 305 U.S. 197, 229 (1938)).

Substantial evidence "is less than a preponderance of the evidence but more than a mere scintilla." *Jesurum v. Sec'y of U.S. Dep't of Health & Human Servs.*, 48 F.3d 114, 117 (3d Cir. 1995).  A single piece of evidence is not substantial evidence if the ALJ ignores countervailing evidence or fails to resolve a conflict created by the evidence. *Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir. 1993).  But in an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's] finding from being supported by substantial evidence." *Consolo v. Fed. Maritime Comm'n*, 383 U.S. 607, 620 (1966).  "In determining if the Commissioner's decision is supported by substantial evidence the court must scrutinize the record as a whole." *Leslie v. Barnhart*, 304 F.Supp.2d 623, 627 (M.D. Pa. 2003).

The question before this court, therefore, is not whether Walizer is disabled, but whether substantial evidence supports the Commissioner's finding that he is not disabled and whether the Commissioner correctly applied the relevant law.

## B. Initial Burdens of Proof, Persuasion, and Articulation.

To receive benefits under Title II or Title XVI of the Social Security Act, a claimant generally must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. §1382c(a)(3)(A); 20 C.F.R. §§ 404.1505(a), 416.905(a). To satisfy this requirement, a claimant must have a severe physical or mental impairment that makes it impossible to do his or her previous work or any other substantial gainful work that exists in the national economy. 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B); 20 C.F.R. §§ 404.1505(a), 416.905(a).

Further, to receive disability insurance benefits under Title II of the Social Security Act, a claimant must show that he or she contributed to the insurance program, is under retirement age, and became disabled prior to the date on which he or she was last insured. 42 U.S.C. § 423(a); 20 C.F.R. § 404.131(a).[4] Unlike

---

[4] "Disability insurance benefits are paid to an individual if that individual is disabled and 'insured,' that is, the individual has worked long enough and paid social security taxes." *Jury v. Colvin*, No. 3:12-CV-2002, 2014 WL 1028439, at *1 n.5 (M.D. Pa. Mar. 14, 2014) (citing 42 U.S.C. §§ 415(a), 416(i)(1)). "The last date that an individual meets the requirements of being insured is commonly referred to as the 'date last insured.'" *Id*. (citing 42 U.S.C. § 416(i)(2)). Here, the ALJ determined that Walizer met the insured-status requirements through March 31, 2026. *Admin. Tr.* at 23, 24.

with disability insurance benefits under Title II of the Social Security Act,

"[i]nsured status is irrelevant in determining a claimant's eligibility for

supplemental security income benefits" under Title XVI of the Social Security Act.

*Snyder v. Colvin*, No. 3:16-CV-01689, 2017 WL 1078330, at *1 (M.D. Pa. Mar.

22, 2017).  Supplemental Security Income "is a federal income supplement

program funded by general tax revenues (not social security taxes)" "designed to

help aged, blind or other disabled individuals who have little or no income." *Id*.

The ALJ follows a five-step sequential-evaluation process to determine

whether a claimant is disabled. 20 C.F.R. §§ 404.1520(a), 416.920(a).  Under this

process, the ALJ must sequentially determine: (1) whether the claimant is engaged

in substantial gainful activity; (2) whether the claimant has a severe impairment;

(3) whether the claimant's impairment meets or equals a listed impairment;

(4) whether the claimant is able to do his or her past relevant work; and

(5) whether the claimant is able to do any other work, considering his or her age,

education, work experience, and residual functional capacity ("RFC"). 20 C.F.R.

§§ 404.1520(a)(4)(i)–(v), 416.920(a)(4)(i)–(v).

The ALJ must also assess a claimant's RFC at step four. *Hess v. Comm'r of

Soc. Sec.*, 931 F.3d 198, 198 n.2 (3d Cir. 2019).  The RFC is "'that which an

individual is still able to do despite the limitations caused by his or her

impairment(s).'" *Burnett v Comm'r of Soc. Sec.*, 220 F.3d 112, 121 (3d Cir. 2000)

(quoting *Hartranft v. Apfel*, 181 F.3d 358, 359 n.1 (3d Cir. 1999)); *see also* 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).  In making this assessment, the ALJ considers all the claimant's medically determinable impairments, including any non-severe impairment identified by the ALJ at step two of his or her analysis. 20 C.F.R. §§ 404.1545(a)(2), 416.945(a)(2).

"The claimant bears the burden of proof at steps one through four" of the sequential-evaluation process. *Smith v. Comm'r of Soc. Sec.*, 631 F.3d 632, 634 (3d Cir. 2010).  But at step five, "the burden of production shifts to the Commissioner, who must . . . show there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with her medical impairments, age, education, past work experience, and residual functional capacity." *Fargnoli v. Massanari*, 247 F.3d 34, 39 (3d Cir. 2001).

The ALJ's disability determination must also meet certain basic substantive requisites.  Most significantly, the ALJ must provide "a clear and satisfactory explication of the basis on which" his or her decision rests. *Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981).  "The ALJ must indicate in his decision which evidence he has rejected and which he is relying on as the basis for his finding." *Schaudeck v. Comm'r of Soc. Sec. Admin.*, 181 F. 3d 429, 433 (3d Cir. 1999).  The "ALJ may not reject pertinent or probative evidence without explanation." *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 204 (3d Cir. 2008).  Otherwise, "'the

7

reviewing court cannot tell if significant probative evidence was not credited or simply ignored.'" *Burnett*, 220 F.3d at 121 (quoting *Cotter*, 642 F.2d at 705).

## IV.  The ALJ's Decision.

On December 1, 2022, the ALJ denied Walizer's claims for benefits. *Admin. Tr.* at 19–44.  She proceeded through the five-step sequential-evaluation process.

### A.  Step One.

At step one of the sequential-evaluation process, the ALJ found that Walizer had not engaged in substantial gainful activity since his alleged onset date of March 2, 2021. *Id.* at 24.

### B.  Step Two.

At step two of the sequential-evaluation process, the ALJ found that Walizer had the following severe impairments: degenerative disc disease, spondylosis, and facet arthropathy of the lumbar spine with radiculopathy and morbid obesity. *Id*. at 25.

The ALJ also found that Walizer had several non-severe impairments including history of blood in the urine and foreign body granuloma of the skin, which the ALJ noted are recorded in medical records from before Walizer's

alleged onset date and "the relevant records do not show any treatment nor complications associated with these impairments." *Id*.[5]

The ALJ also concluded that Walizer's medically determinable impairments of "depression, adjustment disorder with depression and anxiety due to medical condition, substance use disorder, polysubstance, reportedly in remission, substance use disorder, cannabis, ongoing, unspecified disruptive impulse control and conduct disorder, [and] remote history of bipolar disorder, do not cause more than minimal limitations in [Walizer]'s ability to perform basic mental work activities and are therefore nonsevere." *Id*.  In this regard, the ALJ explained:

> Records reflect [Walizer] has a history of hospitalizations due to drug and alcohol issues as well as depression and suicidal ideations.  In addition, [Walizer] has a history of treatment for bipolar disorder, in the form of medication management. During treatment encounters in April 2021 and June 2021, [Walizer]'s insight and judgment were intact, his memory was intact, and he was alert and oriented times three.  Records from December 2021 noted [Walizer]'s depression was stable on prescribed medication.  [Walizer]'s mood and affect were normal and his judgment was good.  In addition, [Walizer]'s memory was normal, his thought process was logical and goal directed, and no suicidal ideations nor delusions were evident. A consultative psychological exam performed in May 2022 indicated [Walizer]'s demeanor and responsiveness to questions was generally cooperative, his manner of relating was fair, and his posture and motor behavior were normal.  In addition, his eye contact was appropriate and his speech was fluent and clear.  Furthermore, [Walizer]'s thought process was coherent

---

[5] For readability purposes, here—and elsewhere—when citing or quoting the ALJ's decision, we omit the ALJ's citations to the record.

and goal directed and his attention, concentration, and memory
were intact, despite fair to poor insight and judgment.

*Id*.

The ALJ also concluded that Walizer's "testimony regarding illegal
substance use and marijuana use is not consistent with the records of evidence." *Id*.
at 26. The ALJ noted that although Walizer had testified "regarding whether he
had ever used illegal substances that he only used marijuana, with his last use a
couple of years ago maybe[,]" during consultative exams in May 2022, he reported
using marijuana daily and that "he had previously used illicit substances, including
cocaine, opium, methamphetamine, and possibly fentanyl." *Id*.

The ALJ considered the four broad areas of mental functioning set forth in
the disability regulations for evaluating mental disorders[6] and in the listings,

---

[6] When "mental impairments are at issue, additional inquiries are layered on
top of the basic five-step disability analysis." *Hess v. Comm'r Soc. Sec.*, 931 F.3d
198, 202 (3d Cir. 2019). The regulations set forth a "special technique" used for
evaluating mental impairments. *See* 20 C.F. R. §§ 404.1520a, 416.920a. As part of
that "special technique," a claimant's degree of functional limitation is rated in
four broad functional areas: understanding, remembering, or applying information;
interacting with others; concentrating, persisting, or maintaining pace; and
adapting or managing oneself. *Id*. at § 404.1520a(c)(3), 416.920a(c)(3). A
claimant's degree of limitation in these functional areas is rated using "the
following five-point scale: None, mild, moderate, marked, and extreme." *Id*. at
§§ 404.1520a(c)(4), 416.920a(c)(4). The ratings in these four broad functional
areas are used at step 2 to determine if the claimant has a severe mental
impairment, and if the claimant has a severe mental impairment, the ratings are
also used at step 3 to determine if the claimant's severe mental impairment meets
or equals a listed mental disorder. *Id*. at §§ 404.1520a(d), 416.920a(d).

known as the paragraph B criteria,[7] and she determined that Walizer had only mild limitations in each area. *Id*. at 26–27. The ALJ recognized that the paragraph B criteria are not an RFC; rather, they "are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process[,]" and the RFC "assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment." *Id*. at 27. And she asserted that the RFC that follows "reflects the degree of limitation" she "has found in the 'paragraph B' mental function analysis." *Id*.

The ALJ also emphasized that in determining the RFC, she considered all Walizer's impairments and included appropriate limitations to account for all impairments. *Id*. And noting that when reviewing the record, she gave special attention "to the duration and frequency of medical conditions for which [Walizer] sought treatment[,]" she determined that "the overall evidence of record supports a finding that any other condition, not specifically mentioned in this decision, but that may be mentioned briefly in the record is not considered severe." *Id*.

---

[7] The listings for mental disorders contain either two paragraphs (A and B) or three paragraphs (A, B, and C). *See* 20 C.F.R. § Pt. 404, Subpt. P, App. 1, 12.00.A.2. Except as to Listing 12.05 (intellectual disorder), paragraph B of each of the listings for the mental disorders sets forth the same four functional criteria as set forth in 20 C.F. R. §§ 404.1520a, 416.920a, and the listings use the same five-point rating scale as those regulations. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, 12.00.A.2.b, 12.00.E, 12.00.F. This is what the ALJ is referring to when she refers to the paragraph B criteria.

The ALJ also noted that "the record indicates [Walizer] reported or exhibited certain signs and symptoms that never culminated into a specific diagnosis establishing a medically determinable impairment[,]" but "[a] medically determinable impairment may not be established solely on the basis of 'symptoms alone,' or on a claimant's allegations regarding symptomatology." *Id*. (citing 20 C.F.R §§404.1508, 416.908, and SSR 96-4p).  The ALJ continued:

> In this regard, the claimant complained of bipolar disorder. Pain and other subjective complaints are not medically determinable impairments.  The diagnosis of subjective complaint is merely a descriptor diagnosis.  As such, these diagnoses are not medically determinable impairments. Subjective complaints, such as pain, are considered only when evaluating the claimant's medically determinable severe impairments.  Subjective complaints alone cannot establish the existence of a medically determinable impairment nor can they support the finding of disability without demonstrated medically acceptable signs or laboratory findings to support the same.

*Id*.

## C.  Step Three.

At step three of the sequential-evaluation process, the ALJ found that Walizer did not have an impairment or combination of impairments that met or medically equaled an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. *Id*. at 27–29.  Specifically, the ALJ considered Listings 1.15  (Disorders of the skeletal spine resulting in compromise of a nerve root(s)), 1.16 (Lumbar spinal

stenosis resulting in compromise of the cauda equina), and 11.14 (Peripheral neuropathy). *Id*. And she evaluated Walizer's obesity under SSR 19-2p. *Id*. at 29.

### D.  The RFC.

The ALJ then determined that Walizer had the RFC to do light work[8] with some limitations. *Id*. at 30.  She concluded that Walizer can frequently balance, but he can only occasionally do postural maneuvers such as stooping, kneeling, crouching, crawling, and climbing ramps and stairs. *Id*.  And he must avoid climbing ladders, ropes, and scaffolds. *Id*.  Further, "[h]e is limited to occupations that require no more than occasional pushing or pulling with the lower extremities, to include the operation of pedals[,]" and he "must avoid concentrated prolonged exposure to temperature extremes, vibration, extreme dampness and humidity, as well as exposure to hazards, such as dangerous machinery and unprotected heights." *Id*.

---

[8] *See* 20 C.F.R. § 404.1567(b) ("Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.  If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.").

In making this RFC assessment, the ALJ considered Walizer's testimony and assertions regarding his limitations. *Id*. at 30.  She acknowledged that Walizer "alleges disability due to bipolar disorder, arthritis, depression, L5/S1 disc desiccation and stenosis, herniated discs, difficulty with sitting and standing, pain that interferes with thinking, and anxiety" *Id*.  Walizer testified that although he is receiving pain management, it is not helping. *Id*.  And the ALJ noted that Walizer testified that he used marijuana, but that he has not used it for a couple of years, and he does not have a medical marijuana card. *Id*.  "He also said that he does not do any chores around the house, any movement causes pain, and he has to get up and stretch when he is in pain, and he has difficulty sleeping because he feels like he has needles on his back and side." *Id*.  He also "indicated he lays down four to five times a day for about 15 to 20 minutes at a time to relieve his back symptoms." *Id*.  And "[h]e testified that he can lift five to ten pounds due to his back, he can stand or walk 30 to 45 minutes, and he can sit 45 minutes to an hour." *Id*.  "He further stated that his mental health medication is no longer effective, and he has not used alcohol in three or four years." *Id*.  The ALJ also recounted that Walizer "reported he has back problems that affect his ability to sit, stand, and walk, and he is in pain all the time." *Id*.  "He indicated that his conditions affect his sleep, and he does not go out." *Id*. at 30–31. The ALJ further recognized that according to Walizer, he "has difficulties performing postural maneuvers," "he has

14

to rest for about five minutes after walking about five feet," "he can pay attention for ten minutes, he does not follow written instructions, and with all the pain he is in, he has a lot of stress." *Id*. at 31. Walizer contends "that pain causes him to stop doing what he is trying to do, and he can only do a little at a time." *Id*.

The ALJ also observed that Walizer's mother reported that he "experiences pain with moving too much," that 'he does not go out to do anything," that he "can walk for about ten feet before he has to rest for ten minutes," that "his ability to pay attention depends on his pain," that he is on medication for stress, and he is bipolar." *Id*.

The ALJ concluded that although Walizer's impairments "could reasonably be expected to cause the alleged symptoms[,]" his "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." *Id*. at 31.

In making the RFC assessment, the ALJ also considered Walizer's medical records and treatment notes, and she concluded that Walizer's "statements about the intensity, persistence, and limiting effects of his symptoms," are inconsistent with the medical records "because records show [Walizer] treated his impairments conservatively with injections, prescribed medications and physical therapy, but he required no hospitalizations nor surgical interventions." *Id*. at 31. "In addition,"

according to the ALJ, the "records show only mild to moderate abnormal findings on physical exams and objective imaging, but such findings do not rise to the level of limitations alleged by [Walizer]." *Id*.

The ALJ summarized the medical records and treatment notes. *Id*. at 31–32. She noted that in March 2021, Walizer presented with complaints of low back pain, he had a reduced range-of-motion in his lumbar spine, he exhibited muscle spasms, and medication was prescribed. *Id*. at 31.  "During a physical exam performed in April 2021 [Walizer] exhibited moderate tenderness with bilateral facet loading, decreased range of motion, and paraspinal muscle tenderness." *Id*. He also "had moderate tenderness over his bilateral sacroiliac joints and positive straight leg raise testing[,]" but his upper and lower extremity strength was 5/5[,] . . . his cranial nerves were grossly intact[,] [and] [he] had normal ranges of motion in his thoracic and cervical spine." *Id*.  "A magnetic resonance imaging (MRI) scan of [Walizer]'s lumbar spine performed in April 2021 revealed mild degenerative changes, more prominent at L5/S1, causing mild stenosis of the bilateral neural foramen." *Id*.  And the ALJ noted that in May 2021, Walizer had lumbar epidural steroid injections. *Id*.

The ALJ recounted the medical records and treatment notes for the rest of 2021:

> According to treatment records from June 2021, [Walizer] reported 90 percent pain relief from a lumbar epidural steroid

injection for greater than seven days, with ongoing improvement.  He also noted no left lower extremity radicular pain since his injection.  Physical exams performed in June 2021, August 2021, and September 2021 revealed decreased lumbar range of motion and paraspinal muscle tenderness, as well as bilateral facet loading with mild to moderate tenderness.  Although he had moderated tenderness over his bilateral sacroiliac joints, [Walizer]'s straight leg raise test was negative and his gait was normal.  In addition, [Walizer]'s lower extremity strength remained 5/5.  Records indicate [Walizer] submitted for bilateral lumbar medial branch blocks at the L2-L5 levels in August 2021 and September 2021.  During follow-up encounters in September 2021 and October 2021, [Walizer] reported 95 percent pain relief from his medial branch blocks for three and two days, respectively, with no reported adverse effects.  A physical exam performed in October 2021 revealed no new findings.

Additional records continued to show similar findings with ongoing conservative care.  In particular, records indicate [Walizer]'s upper and lower strength remained intact at 5/5 bilaterally during an exam performed in November 2021.  In addition, [Walizer]'s gait was intact and his sensation to light touch was intact, despite tenderness to his lumbar facets and pain with flexion and facet loading.  Primary care records from December 2021 noted [Walizer]'s gait and station were normal, his sensation was intact, and his motor strength and tone were normal.

*Id*. at 31–32.

During an exam in January 2022, Walizer "exhibited tenderness in his lumbosacral junction, worse with facet loading/extension," but he "had no strength nor sensory deficits in his extremities, no sacroiliac joint tenderness, and his straight leg raise test was negative bilaterally[.]" *Id*. at 32.  "[H]e submitted for a lumbar medial branch block for treatment of his low back pain." *Id*.  The ALJ

noted that later records showed that Walizer had some relief (20% in March and 60% in April) for a short time (three to four days) from the injections. *Id*. "Additional records from April 2022 noted [Walizer] ambulated independently without gait dysfunction or balance issues and he denied radicular right lower extremity pain, numbness, paresthesias, or weakness." *Id*. The ALJ recounted that although Walizer "exhibited tenderness to palpation along his lumbar spine and bilateral paraspinal musculature, as well as pain with flexion, extension, and lateral rotation, his straight leg raise test was negative and his Patrick's maneuver was negative." *Id*. His sensation was also intact, and his treatment protocol did not change. *Id*.

Walizer had a consultative medical exam in May 2022. *Id*. During that exam, "his gait was normal and his squat was full[,]" and although he "was unable to walk on heels and toes without difficulty, he needed no help getting on and off the exam table and he was able to rise from a chair without difficulty." *Id*. The ALJ noted also that Walizer "exhibited moderate tenderness to palpation over his lumbosacral spine and mild tenderness to palpation over his bilateral sacroiliac joints . . and [his] lumbar ranges of motion were decreased." *Id*. But "his remaining ranges of motion were all within normal limits, his straight leg raise test was negative bilaterally both seated and supine, and his upper and lower extremity

18

strength was 5/5." *Id*.  Also, his "hand and finger dexterity were intact, and his grip

strength was 100 percent full bilaterally." *Id*.

The ALJ noted that "[t]reatment records from July 2022 noted [Walizer]

continued to treat his lumbar impairments with prescribed medications; he had

declined radiofrequency ablation." *Id*.  "Tenderness and worsening facet

loading/extension were revealed on exam, but [Walizer]'s straight leg raise was

negative bilaterally and he had no strength nor sensory deficits in his extremities."

*Id*.

The ALJ concluded that although Walizer's obesity "clearly contributed to

some of his other problems, the evidence fails to show it led to the degree of

limitations he alleged." *Id*. at 33.

The ALJ also considered Walizer's activities of daily living noting that he

"reported activities such as performing personal care, making simple food, doing

the dishes, folding laundry, driving, shopping, handling money and paying bills,

watching television, playing video games, attending appointments, and spending

time and communicating with family and friends, including his girlfriend." *Id*.

Although she "acknowledge[d] that [Walizer] has some limitations performing

these activities, and while none of these activities is dispositive," according to the

ALJ, "taken together and considered in conjunction with the above medical

19

evidence of record, they suggest that [Walizer] can perform work within the above parameters on a sustained and continuous basis." *Id*.

Before turning to the medical opinions in the record, the ALJ observed that "[s]tatements on issues reserved to the Commissioner, including statements as to whether or not a claimant has a severe impairment, has an impairment which meets or medically equals a listed impairment, is disabled, is able to perform past work, or is able to perform any other work, are neither inherently valuable nor persuasive, and are not addressed in detail in this decision." *Id*.  She noted that "[t]his includes any decisions made by the Veteran's Administration regarding disability applications under their own program, as well as Global Assessment of Functioning (GAF) scores[.]" *Id*.  As to the GAF scores, the ALJ later further stated that although she read and considered the GAF scores in Walizer's medical records, she found those GAF scores "of limited evidentiary value[,]" explaining that "[t]hese subjectively assessed scores reveal only snapshots of functioning at that particular appointment." *Id*. at 35–36.  She noted that she "considered evidence such as the results of mental status examinations, [Walizer]'s reported activities of daily living, and other more detailed observations by medical providers, which more accurately describe [Walizer]'s impairments and limitations, as more reliable and pertinent." *Id*. at 36.

20

Turning to the opinion evidence, the ALJ found unpersuasive the opinion of Dr. Ahamed Shamsdeen, who "opined in August 2022 that [Walizer] was limited to sedentary work, he could not work four nor eight hours a day, he could not stand/walk for any period of time, . . . he could sit or drive for one to two hours[,] . . . [he] could not bend, squat, nor climb, he could occasionally reach overhead, and he has not reached maximum medical improvement." *Id*. at 33.  The ALJ concluded that Dr. Shamsdeen's opinion was not consistent with the opinions of Dr. Tedesco and Dr. Hutz, the state agency medical consultants. *Id*.  Nor, according to the ALJ, was Dr. Shamsdeen's opinion supported by the evidence in the record. *Id*.  In this regard, the ALJ noted that the "consultative medical exam showed [Walizer]'s gait was normal, his straight leg raise test was negative bilaterally both seated and supine, and his upper and lower extremity strength was 5/5." *Id*. at 34.  Further, his "lumbar ranges of motion were decreased; however, his remaining ranges of motion were all within normal limits and he was able to rise from a chair without difficulty." *Id*.  Thus, the ALJ concluded that Walizer "retained the ability to sit, stand, and walk, as well as perform postural maneuvers, albeit with some limitations, but not the level of restriction opined by Dr. Shamsdeen." *Id*.  The ALJ also found that "there is nothing in the records that support a finding that [Walizer] cannot work four nor eight hours." *Id*.

The ALJ also considered Dr. Usoh's opinion that from a musculoskeletal standpoint, Walizer could return to work on April 9, 2021. *Id*. Noting that Dr. Usoh's opinion "provides no functional limitations nor does it address [Walizer]'s remaining capabilities[,]" the ALJ found the opinion unpersuasive. *Id*.

The ALJ next considered the opinion of Dr. Stone, a consultative medical examiner. *Id*. She noted that Dr. Stone opined that Walizer "could occasionally lift and carry 20 pounds, he could sit for 20 minutes uninterrupted for a total of five hours, and stand and walk for 15 minutes for a total of three hours." *Id*. "Dr. Stone noted that [Walizer] needed to change positions frequently, but he did not require a cane for ambulation." *Id*. "Dr. Stone further opined that [Walizer] had postural as well as environmental limitations." *Id*. The ALJ found Dr. Stone's opinion partially persuasive:

> Dr. Stone's opinion is persuasive to the extent that it is consistent with and supported by the evidence of record, such as lifting and carrying light weight, a cane is not medically necessary, and [Walizer] could continuously use his bilateral upper and lower extremities for activities. However, Dr. Stone's opined limitations regarding sitting, standing, and walking are not supported by the record. As indicated above, physical exams show [Walizer]'s gait was intact, straight leg raise testing was generally negative bilaterally, and his lower extremity strength was 5/5. In addition, imaging of [Walizer]'s lumbar spine revealed only mild degenerative changes, further supporting fewer limitations than as opined by Dr. Stone.

*Id*.

The ALJ then addressed the opinions of Dr. Tedesco and Dr. Hutz, the state agency medical consultants, who "opined in January 2022 and July 2022, respectively, that [Walizer] could occasionally lift and carry 20 pounds and frequently lift and carry 10 pounds . . . [and] could sit, stand, and walk for approximately six hours in an eight-hour workday." *Id.* "Drs. Tedesco and Hutz further opined that [Walizer] had postural and environmental limitations." *Id.* The ALJ found Dr. Tedesco's opinion persuasive and most of Dr. Hutz's opinion persuasive. *Id.* She explained that "Drs. Tedesco's and Hutz's opinions are consistent with Dr. Stone's opined exertional limitations[,] . . . [and] [their] postural opinions are supported by the records that show [Walizer]'s lumbar spine ranges of motion were decreased and he had mild to moderate tenderness to palpation over his lumbosacral spine and bilateral sacroiliac joints." *Id.* "Furthermore, records show [Walizer]'s gait was intact/normal, his lower extremity strength was 5/5 bilaterally, and his sensation was intact, thereby supporting a finding for work at the light exertional level as opined by Drs. Tedesco and Hutz." *Id.* But, the ALJ concluded, "there is no support for Dr. Hutz's opined limitation regarding occasional balancing, given that the physical exams show [Walizer]'s gait was intact, straight leg raise testing was generally negative bilaterally, and his lower extremity strength was 5/5." *Id.*

Turning to the opinion evidence regarding Walizer's mental impairments, the ALJ found the opinion of consultative psychological examiner Dr. Betts partially persuasive. *Id*. at 35.  Dr. Betts opined that Walizer "had no limitations in understanding and remembering simple instructions, and mild limitations in carrying out simple instructions, in the ability to make judgments on simple work-related decisions, and in understanding and remembering complex instructions." *Id*.  She also opined that Walizer "had moderate limitations in carrying out complex instructions and in the ability to make judgments on complex work-related decisions." *Id*.  "Dr. Betts further opined that [Walizer] had mild limitations in interacting with the public and co-workers, marked limitations in interacting with supervisors, and moderate limitations in responding appropriately to usual work situations and changes in a routine work setting." *Id*.  And "Dr. Betts noted that [Walizer]'s impairments did not affect any other capabilities." *Id*.

The ALJ found Dr. Betts's opinion persuasive "to the extent that it is consistent with and supported by the evidence of record, such as mild limitations in simple instructions and interaction with the public and co-workers." *Id*.  But she concluded that "Dr. Betts's opinion regarding carrying out complex instructions and . . . the ability to make judgments on complex work-related decisions, as well as her opinion regarding marked limitations in interacting with supervisors is not supported by the records." *Id*.  In this regard, the ALJ highlighted that "medical

records reported [Walizer]'s memory was intact[,]" that "he verbalized understanding of treatment plans," that "he was cooperative," that "his thought process was logical and goal directed," and that he "reported that he can get along with authority figures." *Id.*

Finally, as to the opinion evidence,[9] the ALJ found persuasive the state agency psychological consultants' opinions that Walizer's mental impairments were nonsevere. *Id.* She noted that "[r]ecords in evidence indicate [Walizer] treated his mental impairments conservatively with prescribed medication from his primary care provider and he required no inpatient treatment nor hospitalizations due to these impairments since his alleged onset date of disability." *Id.* The ALJ also noted that "medical records revealed normal psychological findings during treatment encounters." *Id.*

The ALJ summarized her finding that Walizer has the RFC to do light work with some limitations as follows:

> In summary, Walizer alleges physical and mental limitations that would preclude him from sustaining regular and continuous work. However, the nature, scope, and findings from his longitudinal treatment records are not supportive of the intensity or persistence of his subjective allegations, and these records are not supportive of more restrictive findings than adopted herein. The residual functional capacity is supported by the medically adopted diagnostic techniques, clinical

---

[9] The ALJ noted that Walizer's mother's statements are not considered medical opinion evidence under the current regulations, and thus, she did not assess the persuasiveness of such. *Admin. Tr.* at 36.

25

> findings, level of treatment, activity level of Walizer, and
> testimony of record.  When considered as a whole, the evidence
> reasonably supports a finding that Walizer is limited by his
> impairments; however, he is capable of doing a range of work
> on a sustained and continuous basis despite the limitations
> resulting from his impairments.

*Id*. at 36.

### E.  Step Four.

At step four of the sequential-evaluation process, the ALJ found that Walizer

could perform his past relevant work as an electronics assembler as generally

performed. *Id*. at 36.

### F.  Step Five.

Given that the ALJ concluded that Walizer could perform his past relevant

work as an electronics assembler, the ALJ was not required to proceed to step 5.

But she nevertheless did so, characterizing her findings at step five as "alternative

findings." *Id*.

At step five of the sequential-evaluation process, considering Walizer's age,

education, work experience, and RFC, as well as the testimony of a vocational

expert, the ALJ found that there were jobs—such as inspector, office helper, and

cashier—that exist in significant numbers in the national economy that Walizer

could perform. *Id*. at 37.  The ALJ noted that that the vocational expert testified

that the cashier position could be performed with a sit/stand opinion and that there were 300,000 jobs with such an option. *Id*.

That ALJ also noted that "the vocational expert testified that while [Walizer] could not perform past work, he could perform the jobs of inspector, office helper and cashier if [he] were further limited to occupations that require [him] to understand, remember and carry out simple instructions, and make simple work-related decisions." *Id*. at 37–38. And the vocational expert testified that there were sedentary jobs—assembly, inspector, and office clerical—that could also "be performed with and without the aforementioned additional limitation[.]" *Id*. at 38.

In sum, the ALJ concluded that Walizer was not disabled from March 2, 2021 (which is the alleged onset date), through that date of the ALJ's decision on December 1, 2022. *Id*. Thus, she denied Walizer's claims for benefits. *Id*. at 38–39.

## V. Discussion.

Walizer presents three claims. First, he contends that the current regulations regarding opinion evidence are contrary to the Social Security Act. Second, he contends that the ALJ failed to properly evaluate his subjective complaints of pain. Third, he contends that the ALJ misstated evidence to avoid reference to evidence

that did not support her conclusions. Addressing each contention in turn, we conclude that Walizer's claims are without merit.

### A. The current regulations regarding opinion evidence do not conflict with the Social Security Act.

Walizer contends that the current regulations regarding opinion evidence are contrary to the Social Security Act. The Social Security Act requires, in pertinent part, that when a decision is "in whole or in part unfavorable" to a claimant, the decision "shall contain a statement of the case, in understandable language, setting forth a discussion of the evidence, and stating the Commissioner's determination and the reason or reasons upon which it is based." 42 U.S.C.A. § 405(b). But because the current regulations generally only require the Commissioner to articulate his or her reasons regarding the consistency and supportability of opinion evidence, according to Walizer, the regulations conflict with the Social Security Act's requirement that the Commissioner set forth the reason or reasons for his or her decision.

The regulations regarding the evaluation of opinion evidence are different for claims filed before March 27, 2017 ("old regulations"), on the one hand, and for claims, like Walizer's, filed on or after March 27, 2017 ("current regulations"), on the other hand. The current regulations applicable here have been described as a "paradigm shift" in the way medical opinions are evaluated. *Mercado v. Kijakazi*,

629 F. Supp. 3d 260, 279 (M.D. Pa. 2022). Under the old regulations, "ALJs were required to follow regulations which defined medical opinions narrowly and created a hierarchy of medical source opinions with treating sources at the apex of this hierarchy." *Id*. at 280. But under the current regulations, "[t]he range of opinions that ALJs were enjoined to consider were broadened substantially, and the approach to evaluating opinions was changed from a hierarchical form of review to a more holistic analysis." *Id*.

Further, under the old regulations, the ALJ assigns the weight he or she gives to a medical opinion. 20 C.F.R. §§ 404.1527(c), 416.967(c). Under the current regulations, however, the ALJ evaluates the persuasiveness of medical opinions and prior administrative medical findings using the following factors: (1) supportability, (2) consistency, (3) relationship with claimant, (4) specialization, and (5) other factors. 20 C.F.R. §§ 404.1520c(c), 416.920c(c). The most important factors are supportability and consistency. 20 C.F.R. §§ 404.1520c(a), 416.920c(a). The ALJ must explain how he or she "considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in" his or her determination or decision. 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2). The ALJ may, but is not required to, explain how he or she considered the remaining three factors in determining the persuasiveness of a medical opinion. 20 C.F.R. §§ 404.1520c(b)(2),

29

416.920c(b)(2).  But if there are two equally persuasive medical opinions about the same issue that are not exactly the same, then the ALJ must explain how he or she considered the other factors. 20 C.F.R. §§ 404.1520c(b)(3), 416.920c(b)(3).

Supportability and consistency are defined in 20 C.F.R. §§ 404.1520c(c), 416.920c(c).  As the regulations provide, supportability means: "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1). "Simply put, supportability is an inquiry geared toward assessing how well a medical source supported and explained their opinion(s)." *Acosta Cuevas v. Commissioner of Social Security*, No. 20-CV-0502, 2021 WL 363682, at *10 (S.D.N.Y. Jan. 29, 2021*), adopting report and recommendation*, 2022 WL 717612, at *1 (S.D.N.Y. Mar. 10, 2022).  On the other hand, consistency means: "The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." 20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(2).  The consistency factor focuses on "how well a medical source is supported, or not supported, by the entire record." *Acosta Cuevas*, 2021 WL 363682, at *10.

Although in his opening brief, Walizer contends that the current regulations conflict the Social Security Act's requirement that any unfavorable decision contain the reason or reasons upon which it is based, in his reply brief, Walizer recognizes that in *Zaborowski v. Comm'r of Soc. Sec.*, 115 F.4th 637, 639 (3d Cir. 2024), the Third Circuit rejected that very argument. The Third Circuit held that the regulation[10] does not conflict with the Social Security Act:

> Like any other regulation, 20 C.F.R. § 404.1520c must follow the statute that authorizes it, which is 42 U.S.C. § 405(a). It does. Zaborowski conflates the authorizing statute's requirement to give *reasons* with the regulation's list of *factors.* A judge may consider many factors yet base a decision on just one or two. And those one or two are the "reasons upon which [the denial of benefits] is based." 42 U.S.C. § 405(b)(1). The statute requires administrative judges to explain only the dispositive reasons for their decisions, not everything else that they considered.
>
> The regulation complies with the statute by requiring administrative judges to explain their dispositive reasons. Administrative judges must always discuss the two most important factors: supportability and consistency. 20 C.F.R. § 404.1520c(b)(2). But if opposing medical opinions are equally well-supported and consistent, then supportability and consistency are not dispositive. If so, the administrative judge must "articulate how [she] considered the other most persuasive

---

[10] Because in *Zaborowski*, the Third Circuit was considering a claim for disability insurance benefits, it addressed only 20 C.F.R. § 404.1520c. Here, however, because we are considering both a claim for disability insurance benefits and a claim for supplemental security income benefits, we address both 20 C.F.R. § 404.1520c and 20 C.F.R. § 416.920c. Thus, whereas we refer to the regulations (in the plural), the court in *Zaborowski* refers to the regulation (in the singular). 20 C.F.R. § 404.1520c and 20 C.F.R. § 416.920c are materially the same. Accordingly, the reasoning of *Zaborowski* applies to both.

> factors." 20 C.F.R. § 404.1520c(b)(3).  So under the regulation,
> administrative judges must always explain the reasons for their
> decisions.  But that does not mean always explaining all the
> factors.

*Id*. at 639.  Walizer asserts that the Third Circuit was wrong.  But he recognizes

that we are bound by the Third Circuit's decision in *Zaborowski*.  Because we are

bound by Zaborowski, Walizer's claim that the regulations conflict with the Social

Security Act is denied.

### B.  The ALJ did not fail to properly evaluate Walizer's complaints of pain.

Walizer contends that the ALJ did not properly evaluated his complaints of

pain.  We disagree.

"An ALJ must carefully consider a claimant's statements about [his]

symptoms, but the ALJ is not required to credit them." *Sudler v. Comm'r of Soc.*

*Sec.*, 827 F. App'x 241, 245 (3d Cir. 2020) (internal citations and quotation marks

omitted).  "The framework for evaluating a claimant's reported symptoms is set

forth in 20 C.F.R. § 404.1529 and Social Security Ruling 16-3p." *Falardo-Weller*

*v. Saul*, No. 1:18-CV-1719, 2020 WL 2542222, at *3 (M.D. Pa. May 19, 2020).

"When evaluating a claimant's symptoms, the ALJ must follow a two-step

process." *Id*.  "The ALJ must first ask whether the claimant has a medically

determinable impairment that 'could reasonably be expected to produce [the

claimant's] alleged symptoms.'" *Id*. (quoting 20 C.F.R. § 404.1529(b)).  "If there is

no medically determinable impairment that could reasonably produce the symptom alleged, the symptom cannot be found to affect the claimant's ability to do basic work activities." *Wilson v. Kijakazi*, No. 4:20-CV-944, 2022 WL 676279, at *15 (M.D. Pa. Mar. 7, 2022). But if there is a medically determinable impairment that could reasonably be expected to produce the alleged symptoms, "the ALJ must evaluate the 'intensity and persistence' of those symptoms to determine how, if at all, they limit the claimant's capacity for work." *Falardo-Weller*, 2020 WL 2542222, at *3.

Here, the ALJ found that Walizer's "medically determinable impairments could reasonably be expected to cause [his] alleged symptoms[.]" *Admin. Tr.* at 31. But she concluded that Walizer's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in [her] decision." *Id*.[11]

---

[11] Walizer contends that this language is boilerplate. We agree that this language, which is found in most, if not all, ALJ decisions, is boilerplate. "[B]ut boilerplate is error only when there is no case specific analysis to back it up." *Silver v. Kijakazi*, No. 21-CV-01918-RAL, 2024 WL 53019, at *4 (E.D. Pa. Jan. 3, 2024). Here—as the summary of the ALJ's decisions set forth above and as the discussion that follows show—the ALJ provided case specific analysis to back up this boilerplate statement.

"In evaluating the intensity and persistence of a claimant's alleged symptoms, the ALJ is required to 'consider all of the available evidence, including . . . medical history, the medical signs and laboratory findings, and statements about how . . . symptoms affect' the claimant." *Falardo-Weller*, 2020 WL 2542222, at *3 (quoting 20 C.F.R. § 404.1529(a)).   "The Social Security Administration has recognized that individuals may experience their symptoms differently and may be limited by their symptoms to a greater or lesser extent than other individuals with the same medical impairments, signs, and laboratory findings." *Sager v. Kijakazi*, No. 3:21-CV-100, 2022 WL 773917, at *12 (M.D. Pa. Feb. 11, 2022), *report and recommendation adopted*, 2022 WL 757237, at *1 (M.D. Pa. Mar. 11, 2022).   "Thus, to assist in the evaluation of a claimant's subjective symptoms, the Social Security Regulations identify seven factors which may be relevant to the assessment of the severity or limiting effects of a claimant's impairment based on a claimant's symptoms." *Id*. at 13 (citing 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3)).   "These factors include: activities of daily living; the location, duration, frequency, and intensity of the claimant's symptoms; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate his or her symptoms; treatment, other than medication that a claimant has received for relief;

any measures the claimant has used to relieve his or her symptoms; and, any other factors concerning the claimant's functional limitations and restrictions." *Id*.

"An ALJ's findings based on the credibility of a claimant are to be accorded great weight and deference, since an ALJ is charged with the duty of observing a witness's demeanor and credibility." *Wilson*, 2022 WL 676279, at *16.[12] But "[a]n ALJ is not free to discount a claimant's statements about his or her symptoms or limitations for no reason or for the wrong reason." *Id*.

Applying the above standards to the present record, we conclude that the ALJ's analysis of Walizer's symptoms and pain is supported by substantial evidence. As detailed above, the ALJ considered Walizer's statements concerning the intensity, persistence, and limiting effects of his symptoms in light of the medical record, the medical opinions, and Walizer's daily activities. And she adequately explained her reasons for finding Walizer's statements concerning the intensity, persistence, and limiting effects of his symptoms not entirely consistent with the medical evidence and other evidence in the record.

Walizer complains, however, that the ALJ substituted her lay opinion for medical evidence. But that is not what the ALJ here did. Rather, as she is required

---

[12] Although evaluation of a claimant's alleged symptoms may involve an evaluation of the claimant's credibility regarding the limiting effects of those symptoms, SSR 16-3p eliminated the term "credibility" from the Social Security Administration's policy guidance in order to "clarify that subjective symptom evaluation is not an examination of the individual's character." SSR 16-3p, 2016 WL 1119029 at *1.

under the regulations, the ALJ reviewed the entire record, including the medical

records and medical opinions, and explained why she found the medical opinions

persuasive or not by considering whether they were supported by the other medical

evidence in the record.  And contrary to Walizer's suggestion, this is not a case

where there is no medical evidence supporting the ALJ's decision.  Rather, as set

forth above, the state agency medical consultants' opinions support the ALJ's

decision.

Walizer also complains about the ALJ's characterization of his treatment as

conservative.  He contends that "[t]he ALJ does not have a standard for what is, or

i[s] not, conservative treatment other than her own idea, apparently, that non-

conservative treatment would require visits to an ER or surgery." *Doc. 23* at 21.

And he asserts that "[m]ultiple injections into the spine may not be surgery but

they certainly are invasive procedures." *Id.*  Nevertheless, the treatment that

Walizer received is one of the factors that the ALJ is directed to consider.  And

here, it was only one of several factors that the ALJ considered.  Further, it is

sufficiently clear that she understood the treatment that Walizer received.  Thus,

we discern no error in the ALJ's characterization of Walizer's treatment as

conservative. *See Sudler v. Comm'r of Soc. Sec.*, 827 F. App'x 241, 245 (3d Cir.

2020) (describing injections and pain psychology management as "relatively

routine and conservative" treatment).

Walizer also complains about the ALJ's conclusion that his activities of daily living suggest that he has the RFC set forth by the ALJ. "Disability does not mean that a claimant must vegetate in a dark room excluded from all forms of human and social activity." *Smith v. Califano*, 637 F.2d 968, 971 (3d Cir. 1981). And "[i]t is well established that sporadic or transitory activity does not disprove disability." *Id*. at 971–72; *see also Fargnoli v. Massanari*, 247 F.3d 34, 40 n.5 (3d Cir. 2001) (noting that "Fargnoli's trip to Europe in 1988 cannot be the basis for a finding that he is capable of doing a light exertional job because sporadic and transitory activities cannot be used to show an ability to engage in substantial gainful activity"). "[N]evertheless, an ALJ may properly consider a plaintiff's activities of daily living when evaluating her subjective complaints of pain or other symptoms." *Thomas v. O'Malley*, No. 3:22-CV-01774, 2024 WL 1333033, at *5 (M.D. Pa. Mar. 28, 2024) (citing *Turby v. Barnhart*, 54 F. App'x 118, 122 n.1 (3d Cir. 2002)). In fact, a claimant's daily activities is one of the factors that the ALJ is required to consider when evaluating a claimant's symptoms and limitations. 20 C.F.R. § 404.1529(c)(3)(i). Here, the ALJ specifically noted that none of Walizer's activities were dispositive, but "taken together and considered in conjunction with the . . . medical evidence of record, they suggest that [Walizer] can perform work within the above parameters on a sustained and continuous basis." *Admin. Tr.* at 33. While a different factfinder may have weighed Walizer's

activities of daily living differently, the ALJ did not err in considered them as one among other factors that figured into her decision.

Walizer also contends that the evidence that the ALJ cited actually supports his allegations of pain and limitations. In effect, he suggests that the court accept his analysis of the evidence over the analysis set forth by the ALJ. But we cannot reweigh the evidence. *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356. 359 (3d Cir. 2011) ("Courts are not permitted to re-weigh the evidence or impose their own factual determinations."); *Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005) ("In the process of reviewing the record for substantial evidence, we may not 'weigh the evidence or substitute [our own] conclusions for those of the fact-finder.'" (citation omitted)). And "[t]he presence of evidence in the record that supports a contrary conclusion does not undermine the Commissioner's decision so long as the record provides substantial support for that decision." *Malloy v. Comm'r of Soc. Sec.*, 306 F. App'x 761, 764 (3d Cir. 2009). Here, the ALJ fulfilled her duty in evaluating the evidence and explaining why she chose to credit some evidence over other evidence.

In sum, because the ALJ adequately explained her credibility determination, the ALJ's decision in this regard is supported by substantial evidence.

**C.  The ALJ did not materially misstate the evidence to avoid reference to evidence that did not support her conclusions.**

Walizer contends that the ALJ misstated evidence to avoid reference to evidence that did not support her conclusions.  The only purported misstatement, however, that Walizer points to involves the ALJ's discussion of his April 2021 MRI. *See doc. 23* at 29 ("There are several instances where the ALJ misstated the evidence but this argument is confined to the failure of the ALJ to recognize that the plaintiff's MRI showed a disc herniation.").

The ALJ cited to Walizer's April 2021 MRI as follows: "A magnetic resonance imaging (MRI) scan of [Walizer]'s lumbar spine performed in April 2021 revealed mild degenerative changes, more prominent at L5/S1, causing mild stenosis of the bilateral neural foramen." *Admin. Tr.* at 31.  That is almost a direct quote from the MRI report, which under "Impression:" reads: "Mild degenerative changes, more prominent at L5/S1 causing mild stenosis of bilateral neural foramen." *Id*. at 418.  Walizer complains, however, that the ALJ failed to recognize that the MRI showed a disc herniation.  An earlier part of the MRI report does refer to a herniated disc; it provides: "At L5/S1, there is disc desiccation. Posterior central and bilateral paracentral disc herniation is seen.  Degenerative hypertrophic facets are seen.  In combination, mild stenosis of bilateral neural foramen identified.  The central spinal canal is patent." *Id*.  In his opening brief, Walizer contends that the ALJ "passed the MRI off as showing 'degenerative

changes.'" *Doc. 23* at 29.  But, he continues, a disc herniation supports his complaints of pain, and the ALJ should not have ignored such evidence." *Id*. at 30.

Although "[t]he ALJ must consider all relevant evidence when determining an individual's residual functional capacity," *Fargnoli v. Massanari*, 247 F.3d 34, 41 (3d Cir. 2001), "[t]here is no requirement that the ALJ discuss in [her] opinion every tidbit of evidence included in the record." *Hur v. Barnhart*, 94 F. App'x 130, 133 (3d Cir. 2004).  Here, when read as a whole, we conclude that the ALJ did not ignore the MRI or that Walizer had a disc herniation.  Rather, she recognized that he was claiming he was disabled because of a disc herniation. *See Admin. Tr.* at 30. And she considered the MRI and accurately set forth the final impression section of the MRI report. *Id*. at 31.  The fact that she did not specifically mention other parts of the report, does not mean that she did not consider the report or that her decision is not support by substantial evidence.

In his reply brief, Walizer admits that "he may have overstated this issue." *See doc. 34* at 13.  And, he continues, "[i]n itself, this one characterization of the evidence is not reversible." *Id*.  But he asserts that "[i]t points, nonetheless, to the conclusion that the ALJ did not fully understand the evidence supporting plaintiff's subjective complaints." *Id*.  We agree that the ALJ's characterization of the MRI is not reversible error.  We disagree, however, that the ALJ did not fully understand the evidence.  Rather, the ALJ issued a thorough decision that reviewed the

relevant evidence, and, as stated above, when that decision is read as whole, we conclude that the ALJ did not ignore the MRI or that Walizer had a disc herniation. We understand that Walizer disagrees with the ALJ's decision, but that does not mean the decision is not supported by substantial evidence.

## VI.  Conclusion.

For the foregoing reasons, we will affirm the decision of the Commissioner. An appropriate order follows.

_**S/Susan E. Schwab**_
Susan E. Schwab
United States Magistrate Judge